# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| ROY D. VANCE, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 04-0676-CV-W-NKL-P |
| ) | |
| DONALD ROPER, et al., ) | |
| ) | |
| Respondents. | |

**OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**

Petitioner, who is confined in the Potosi Correctional Center in Mineral Point, Missouri, filed this petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his 2002 convictions and sentences for two counts of first-degree murder and one count of armed criminal action, which were entered in the Circuit Court of Boone County, Missouri. Although petitioner raised two (2) grounds for relief in his petition, Ground 2 was severed and dismissed with prejudice to its reassertion at a later date upon petitioner's own motion. See Doc. Nos. 11, 15, 21, and 37. In petitioner's remaining Ground 1, he contends that the evidence was insufficient to convict him of both counts of murder and the one count of armed criminal action because the state did not show that he deliberated.

When petitioner raised his claim that there was insufficient evidence that he personally deliberated in the deaths of the victims on direct appeal, the Missouri Court of Appeals, Western District, summarized the facts as follows:

> The evidence, viewed in the light most favorable to the judgment, shows that Roy Vance was incarcerated in June 2000 at the Huntsville jail in Randolph County after an unsuccessful escape attempt from the jail in Macon County. In the early morning hours of June 22nd, two persons

made an armed attempt to break Vance out of the Huntsville jail. The armed gunman, Michael Tisius, a former Huntsville cellmate of Vance's, accompanied by Vance's girlfriend Tracie Bulington, shot and killed two deputies on duty, Jason Acton and Leon Egley.

For several weeks prior to the day of the shootings Vance and Tisius were both confined in the Huntsville jail and discussed ways that Vance could get out of jail. After considering that posting bond and absconding would be too expensive, they agreed that Tisius, who was getting out soon, would return with Bulington and a gun, force the jailers into a cell, and then release Vance. If the jailers resisted getting into a cell, Tisius was to "coerce [the guards] back to the back," give the gun to Vance, and Vance would "coerce them to either let him out or do whatever he had to do."

James Foote, a cellmate of Vance's, testified that Tisius told Vance that he was going to shoot the guards. Vance said not to do so "unless they try to act hero" but nonetheless instructed Tisius to "do what [he had] to do," if the guards struggled with Tisius. Vance also instructed Tisius to make sure that guard Acton was working, believing that he was "not brave enough to act hero." Cellmate James Foote further testified that Tisius, while incarcerated, had said he "want[ed] to act like John Gotti and come back and break us all out of jail."

In preparing for the escape, the following evidence taken from the trial record details what transpired. On or about June 1st of 2000, Vance telephoned Bulington from the Huntsville facility and asked her to "get a gun." In a subsequent telephone call to Bulington on the 5th of June, Vance told Bulington that if things did not go the way he wanted with his probation officer, he was going to come out one way or another. In a series of conversations between Vance and Bulington over the next few days, Vance told Bulington that if she would obtain work release for Tisius, he would fill her in upon her picking him up for work. After informing Vance that she was unsuccessful in her attempt to obtain work release for Tisius, Vance told Bulington that "they will have to do it another way."

Around June 11th, Bulington received letters from Vance reiterating that he was "coming out one way or another." Shortly thereafter, sometime in the second week of June, Tisius was released. Upon his release, cellmate Tommy Antle overheard Tisius tell Vance, "I'll

2

get you out." Vance later spoke with Bulington, and informed her that Tisius was released. He also stated that he "hoped [Tisius] stood by his promise."

Around June 15th, Tisius contacted Bulington through Karl Bartholomew. Tisius told Bulington that he had Vance's bond money but that he needed a ride from Illinois. About the time that Tisius contacted Bulington, cellmate Tommy Antle managed to read parts of a letter from Bulington to Vance. Antle testified that the letter contained some sort of a code for escape that used packs of cigarettes. He also said that the letter mentioned putting the guards in a holding cell.

On June 16th, Tisius again spoke with Bulington. She agreed to pick him up in Columbia. The following day, Bulington and a friend picked up Tisius in Columbia. It was here that Tisius filled her in on the escape plan. He told her that he had spoken with Vance, that Tisius was to get a gun, put the jailers in a holding cell, unlock and free whoever wanted out.

The following day, Tisius and Bulington went to Karl Bartholomew's house, where Tisius gave Bartholomew a letter from Vance, detailing his plan and asking for his assistance. After an upset Bartholomew refused, Tisius threw the letter in Bulington's car, where police later retrieved it.

Tisius filled Bulington in on more details of the plan. He told her that Vance had told him to "obtain a gun, go into the jail, put the jailers in a holding cell, get the keys and unlock all of the cells and let out whoever wanted out." He also told her that Vance said none of the guards were brave enough to act hero and he wanted a particular guard to be on duty, Jason Acton. That day, Bulington telephoned Vance and told him that Tisius was there. After Vance inquired, Bulington replied that she did not know "if he would go through with it."

In the early morning hours of June 18th, Tisius and Bulington went to the jail to assess who was working and to bring Vance some cigarettes. That night, Bulington gave Tisius a .22 caliber revolver from her mother's house. Tisius brought this revolver into the jail on every occasion from then on. The jailers on duty found it strange that both Tisius and Bulington appeared nervous and possibly on drugs, likely speed.

3

The next day, the 19th, Tisius and Bulington arrived at the jail in the early morning again with cigarettes for Vance. On this occasion, Tisius mentioned to Bulington about going in "in a blaze of glory." On June 20th, Tisius made an unsuccessful attempt to get a bigger gun, because Vance had said that a .22 wasn't big enough.

On June 21st, Tisius and Bulington again went to the jail in the early morning to see if Acton was working, which he was not. More cigarettes were brought for Vance. That day, Bulington overheard Tisius on the phone say "between twelve and four." Directly thereafter, Vance called Bulington and asked her if Tisius was going to go through with it. He added that if everything went down right, he would see her that night. It was in one of these conversations that cellmate Antle overheard Vance discussing the code for the cigarettes – that two packs was "a go" and that one pack was "not a go."

On the morning of June 22nd, Tisius and Bulington arrived at the jail a final time. Bulington walked to the counter where Deputy Egley was sitting, handed him cigarettes and told him they were for Vance. Coming up to the counter, Tisius asked Egley about the whereabouts of Deputy Acton. Egley replied that he was in back.

When Acton emerged, he sat down at the computer behind the counter and began talking with Tisius as Egley worked at the typewriter. Tisius then pulled a gun from his waistband, pointed it at Acton, and shot the deputy in the left side of the forehead. The bullet angled down through the front and bottom part of the deputy's brain, passed through the brainstem, and eventually lodged itself in his cerebellum, killing him almost instantly. Deputy Egley quickly jumped up but fell to the ground after Tisius ran around the counter and shot him. Tisius grabbed the keys and ran to the detention area.

At this time, Deputy Wilburt White was walking to the front entrance of the jail and looked through the window in the front door. From this position, White ran to a nearby deputy's house.

Back in the jail, Vance was lying in his cell asleep. Tisius entered the detention area and attempted to unlock Vance's cell but was unable to do so. From within the cell, Vance said, "I am not going." As Tisius and Bulington were leaving, Deputy Egley grabbed Tisius' leg and Tisius shot him twice more. The two then ran to her car and drove away. Vance was seen destroying a note that was under his bunk, which was

4

flushed in the cell toilet by a cellmate.

Deputy White and other responding officers arrived at the scene shortly thereafter and found Deputy Egley still breathing. However, he died later as a result of three gunshot wounds to the head.

Tisius and Bulington were arrested later in Wathena, Kansas. The letter from Vance to Bartholomew was found upon a search of the vehicle. On April 8th, 2002, Vance, incarcerated for these crimes, explained to a cellmate that he was wearing special handcuffs because he "killed two cops."

Respondents' Exhibit F, pp. 2-7 (footnote omitted). See also State v. Vance, 111 S. W. 3d 553 (Mo. Ct. App. 2003).

The state court's findings of fact are presumed correct unless petitioner rebuts that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Credibility determinations made by the state courts are entitled to great deference in a federal habeas proceeding. See Clemons v. Luebbers, 381 F.3d 744, 755 (8th Cir. 2004), petition for cert. filed, No. 04-9356 (Mar. 21, 2005). Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

In considering the merits of petitioner's insufficient evidence claim on direct appeal, the Missouri Court of Appeals, Western District, affirmed the trial court's judgment:

A person commits the crime of murder in the first degree if he (1) knowingly (2) causes the death of another person (3) after deliberation upon the matter. § 565.020 RSMo 1994; **State v. O'Brien**, 857 S.W. 2d 212, 217 (Mo. banc 1993). To convict a defendant of first degree murder on a theory of accomplice liability, the State must prove that the accomplice deliberated upon the murder; the element of deliberation cannot be imputed. **State v. Rousan**, 961 S.W.2d 831, 841 (Mo. banc

5

>  1998). A submissible case of accomplice liability for first degree murder exists where there is some evidence that the accomplice made a decision to kill the victim prior ro the murder from which the fact finder could infer that the accomplice cooly deliberated on the victim's death. **Id**.

Respondents' Exhibit F, p. 7.

The state appellate court stated that, because Vance was not the individual who actually fired the shots, the State tried him on a theory of accomplice liability:

> An "accomplice" is one who – before or during the commission of a crime – intentionally and knowingly aids or encourages another's crime. **Id**. As an accomplice, a defendant is criminally responsible for the offense. **Id**.
>
> In a charge of murder in the first degree based on accomplice liability, however, deliberation may not be imputed to the defendant by his codefendant's acts. **Id**. at 841. Deliberation, as with most other elements if *mens rea*, is usually shown through proof of the circumstances surrounding the killing. **State v. Gilmore**, 661 S.W. 2d 519, 525 (Mo. banc 1983). But where defendant is charged as an accessory and does not participate in the act of killing, the manner in which the victim was killed cannot prove the premeditation of the accomplice. **State v. O'Brien**, 857 S.W.2d 212, 219 (Mo. banc 1993). Vance argues that there was no evidence that would allow the fact finder to infer that he personally deliberated upon the deaths of the two victims. He further argues that because he told Tisius "don't shoot the guards unless they act hero" and that the guards were shot without showing any resistence that his deliberation was "conditional" and that the contingency never occurred because he could not and did not know Tisius would immediately shoot the guards without cause or provocation.

Respondents' Exhibit F, pp. 8-9.

Although the Missouri Court of Appeals agreed with petitioner that his mere participation in the planning of the escape could not satisfy the deliberation requirement for first degree murder, the court, in viewing the evidence in the light most favorable to the state, found that: (1) the trial court, as finder of fact,

6

was free to disbelieve all or part of any testimony from witnesses; (2) Vance's argument ignored other[1] statements made by Tisius to Vance or in his presence about shooting the guards if they had to and that Tisius told Vance he planned to shoot the guards; (3) the factfinder was not required to believe Vance's self-serving statement that he told Tisius to kill the guards only if necessary; (4) two other pieces of evidence were highly indicative of premeditation – Vance's statement to Tisius that the .22 revolver was not big enough and a letter Vance wrote to another person apparently seeking his help for Tisius in which Vance said that "the cameras don't record anything so they wouldn't even have a clue who did it."[2] Respondents' Exhibit F, pp. 10-11.

The Missouri Court of Appeals found that petitioner's case was similar to State v. Betts, 646 S.W. 2d 94, 97 (Mo. banc 1983), where the defendant agreed that, if anyone was in the house during the burglary, they would have to be killed. The state appellate court distinguished petitioner's case from the cases petitioner cited in his appeal brief, State v. O'Brien, 857 S.W.2d 212 (Mo. banc 1993), and State v. Gray, 887 S.W. 2d 369 (Mo. banc 1994), cert. denied, 514 U.S. 1042 (1995), because Vance not only had prior knowledge of use of a deadly weapon, but also arranged for Tisius to obtain a weapon and even urged him to find a bigger one.

Unlike the facts in O'Brien, petitioner continued with the planning and preparation of the escape after he became aware of Tisius's intent and plan to kill the jail guards well before the night of the murders

---

[1] Tisius was convicted of two counts of first degree murder and armed criminal action and was sentenced to death. See State v. Tisius, 92 S.W.2d 751 (Mo. banc 2002), cert. denied, 539 U.S. 920 (2003).

[2] The state appellate court believed that this statement would be true only if there were no eyewitnesses left to identify the perpetrators. Respondents' Exhibit F, p. 11.

7

and, through Bulington[3] and directly, urged Tisius to remain strong and determined to carry things out. Respondents' Exhibit F, pp. 11-12.

The state appellate court found no state court authority that all or more than one of the circumstances discussed in Gray, supra at 376-77, must be present to support a finding of premeditation by an accomplice and concluded that "[t]here was ample evidence in the record for the fact finder to make an inference about Vance's separate premeditation." Respondents' Exhibit F, p. 12. Moreover, the state appellate court held that the "fact finder was entitled to disbelieve the evidence that there was ever any condition or contingency," as petitioner argued, that the guards were only to be shot if they resisted and that there was no evidence that they resisted because "[t]here remained ample evidence that Vance provided the mechanism of death(the gun), knew of Tisius's intent to kill the guards, and joined and continued separately and fully participated in the plan to murder the jail guards in securing his escape." Id. at 12-13.

Petitioner has failed to show that the Missouri Court of Appeals' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law" or that it was "based on an unreasonable determination of the facts in light of the evidence presented" at trial. 28 U.S.C. § 2254(d)(1) and (2). A federal court, in reviewing a sufficiency of the evidence claim, must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (constitutional standard for judging sufficiency of the evidence in criminal trials); Weston v.

---

[3]Bulington entered guilty pleas to two counts of first degree murder and was sentenced to life imprisonment. Case No. 14R050000807 (Randolph County Circuit Court Aug. 18, 2002).

8

Dormire, 272 F.3d 1109, 1111 (8th Cir. 2001) ("In determining the sufficiency of the evidence in habeas cases under 28 U.S.C. § 2254, we view the evidence in the light most favorable to the prosecution and decide whether any rational jury could have found, beyond a reasonable doubt, all of the elements of the crime."). The fact finder is given latitude "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. Jackson v. Virginia, 443 U.S. at 319.

The evidence in this case is sufficient to support petitioner's convictions under the above standards. A rational trier of fact could have found that petitioner personally deliberated upon the deaths of the two victims before or during the commission of the crime by intentionally aiding or encouraging Tisius's shooting of the victims.[4] See, e.g., Copeland v. Washington, 232 F.3d 969, 976 (8th Cir. 2000), cert. denied, 532 U.S. 1024 (2001). Petitioner has failed to show that the state courts' decisions were "contrary to, or involved an unreasonable application of, clearly established Federal law" or that their decisions were "based on an unreasonable determination of the facts in light of the evidence presented" at trial. 28 U.S.C. § 2254(d)(1) and (2).

Accordingly, it is **ORDERED** that the petition for writ of habeas corpus will be denied, and this case is dismissed with prejudice.

        /s/ Nanette K. Laughrey  
        NANETTE K. LAUGHREY  
        UNITED STATES DISTRICT JUDGE

Jefferson City, Missouri,

Dated: 8/31/05_____.

---

[4] Petitioner did not raise a specific claim in the state courts that the evidence presented at trial was insufficient to convict him of the armed criminal action charge.

10